SLR:BDM:KKO
F. #2019V02611

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

        Plaintiff,                  VERIFIED COMPLAINT *IN REM*

  – against –                      Civil Docket No. 20-2222

ONE CUNEIFORM TABLET KNOWN AS
THE "GILGAMESH DREAM TABLET,"

        Defendant *in rem*.

- - - - - - - - - - - - - - - - - - - X

        Plaintiff, United States of America, by its attorney, RICHARD P. DONOGHUE, United States Attorney for the Eastern District of New York, Karin Orenstein, Assistant United States Attorney, of counsel, for its verified complaint *in rem*, hereby alleges upon information and belief as follows:

## PRELIMINARY STATEMENT

    1.  Plaintiff brings this action *in rem* to condemn and forfeit to the use and benefit of the United States the above-captioned property pursuant to 19 U.S.C. § 1595a(c)(1)(A), as stolen Iraqi property that was introduced or attempted to be introduced into the United States contrary to 18 U.S.C. § 2314.

## DEFENDANT *IN REM*

    2.  The Defendant *in rem* is a large cuneiform tablet bearing part of the Epic of Gilgamesh. Cuneiform is an ancient system of writing on clay tablets that was used

in ancient Mesopotamia thousands of years ago. These clay tablets were generally not baked or fired in antiquity and must be handled carefully to avoid damage.

3. Cuneiform tablets have been the subject of substantial looting in Iraq. Hundreds of thousands of objects are estimated to have been looted from archaeological sites throughout Iraq since the early 1990s. Cuneiform tablets comprise one of most popular types of looted Iraqi artifacts on the antiquities market.

4. The Gilgamesh epic is a Sumerian epic poem written in cuneiform. A twelve-tablet Babylonian version, written in Akkadian, was discovered in 1853 in the ruins of the library of the Assyrian King Assur Banipal in Nineveh (located in modern-day northern Iraq). The events in the epic revolve around King Gilgamesh of Uruk (located in modern-day southern Iraq). The epic is considered one the world's oldest works of epic literature.

5. The Defendant *in rem* measures approximately 6" by 5" and is written in the Akkadian language. It is known as the "Gilgamesh Dream Tablet" because it contains a portion of the Gilgamesh epic in which the protagonist describes his dreams to his mother and she interprets them as foretelling the arrival of a new friend. She tells the protagonist, "You will see him and your heart will laugh." The names of the hero, Gilgamesh, and the character who becomes his friend, Enkidu, are replaced in this tablet with the names of deities Sin and Ea.

6. On or about September 24, 2019, the Defendant *in rem* was seized from the Museum of the Bible in Washington, D.C. by agents of the Department of Homeland Security, Homeland Security Investigations ("HSI"). On or about the same date, HSI agents

transferred custody of the Defendant *in rem* to U.S. Customs and Border Protection, which is currently storing the Defendant *in rem* in Queens, New York.

7. A photograph of the Defendant *in rem* is attached as Exhibit A.

## JURISDICTION AND VENUE

8. This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

9. Venue in the Eastern District of New York is proper, pursuant to Title 28, United States Code, Sections 1355(b)(1)(B) and 1395(b), in that the Defendant in rem is presently located in Queens, New York, which lies within the Eastern District of New York.

## STATUTORY FRAMEWORK

Applicable Forfeiture Law

10. Title 19, United States Code, Section 1595a(c)(1)(A) provides in pertinent part that "[m]erchandise which is introduced or attempted to be introduced into the United States contrary to law . . . shall be seized and forfeited if it . . . is stolen, smuggled, or clandestinely imported or introduced." *Id*.

11. Merchandise is introduced or attempted to be introduced "contrary to law" if the importation violates Title 18, United States Code, Section 2314. This Section provides in pertinent part:

> Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise . . . of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud;

violates the law.

3

12. Cultural property is considered "stolen" under Title 19, United States Code, Section 1595a(c)(1)(A) and Title 18, United States Code, Section 2314, if it was taken without official authorization from a foreign country whose laws establish state ownership of such cultural property.

Legal Protections for Iraqi Cultural Property

13. U.S. Prohibitions on Importation. The importation of Iraqi cultural property into the United States has been restricted since 1990. In 1990, the United States implemented a general ban on importation of any Iraqi goods via the Iraqi Sanctions Regulations, codified at Title 31, Code of Federal Regulations, Part 575. In 2004, Title 31, Code of Federal Regulations, Section 575.533 was amended to lift the general ban while retaining more limited restrictions, including a ban on the importation of "Iraqi cultural property or other items of archeological, historical, cultural, rare scientific, and religious importance illegally removed from the Iraq National Museum, the National Library, and other locations in Iraq since August 6, 1990." Per Section 575.533(b)(5), "[a]ny trade in or transfer of such items, including items with respect to which reasonable suspicion exists that they have been illegally removed, remains prohibited . . . ." In 2010, the Iraqi Sanctions Regulations were repealed and replaced with the Iraq Stabilization and Insurgency Sanctions Regulations, codified at Title 31, Code of Federal Regulations, Part 576. In particular, Section 576.208 prohibits "the trade in or transfer of ownership or possession of Iraqi cultural property or other items of archeological, historical, cultural, rare scientific, and religious importance that were illegally removed, or for which a reasonable suspicion exists that they were illegally removed, from the Iraq National Museum, the National Library, and other locations in Iraq since August 6, 1990." The regulation incorporates the criminal and

4

civil penalties set forth in the International Emergency Economic Powers Act (codified at Title 50, United States Code, Section 1705).

14. <u>Iraqi Patrimony Law</u>. Under Article 3 of Iraq's Antiquities Law No. 59 of 1936 (as amended in 1974 and 1975), all antiquities found in Iraq, whether movable or immovable, on or under the ground, are considered property of the state. Under Article 16 of Antiquities Law No. 59, private persons generally cannot possess antiquities. Where private possession is authorized, the antiquities must be registered with the government and may only be transferred to another Iraqi party with government approval. Article 26 of Antiquities Law No. 59 prohibits the export of Iraqi antiquities. The law's definition of "antiquities" includes movable possessions which were made, produced, sculpted, written or drawn by man and which are at least 200 years old. In 2002, Iraq issued the Antiquities and Heritage Law, Law No. 55 of 2002, which contains similar provisions.

**FACTUAL BACKGROUND**

<u>Purchase and Importation of the Gilgamesh Dream Tablet in 2003</u>

15. In or prior to 2001, a U.S. antiquities dealer (the "Antiquities Dealer") viewed cuneiform tablets on the floor of an apartment in London, England in the United Kingdom belonging to Jordanian antiquities dealer Ghassan Rihani. The Antiquities Dealer knew Rihani as a source of supply for Middle Eastern antiquities who obtained antiquities directly from the Middle East. According to public reports, Rihani passed away in 2001.

16. In or about March or April 2003, the Antiquities Dealer and an expert in cuneiform (the "Cuneiform Expert") visited Rihani's London apartment. During this visit, they met with one of Rihani's family members and viewed the cuneiform tablets on the floor. The tablets had not been conserved. They did not appear to be the types of cuneiform tablets

5

more typically found which report on economic or other mundane events. Rather, the cuneiform writing appeared denser and potentially of a literary nature. Among these was a partial tablet that was not readable due to encrustations on the surface. The Antiquities Dealer and Cuneiform Expert decided that although they were unreadable, these cuneiform tablets were potentially rare and valuable. They agreed to pay $50,350 for a number of items including all of the tablets and shipped the purchased items from London to the Cuneiform Expert's address in the United States by international post.

17. After receiving the tablets by mail in the United States, the Cuneiform Expert preserved the partial tablet by baking and cleaning it and removing encrusted material from its surface. The Cuneiform Expert then read the cuneiform writing on the tablet and identified it as part of the Gilgamesh epic.

18. In or about March 2005, the Cuneiform Expert shipped the partial tablet (hereinafter, the "Gilgamesh Dream Tablet") across state lines to Princeton, New Jersey where it was studied by a professor (the "Professor"). The Professor received the tablet and studied it in Princeton, New Jersey for several weeks.

Sale of the Gilgamesh Dream Tablet with a False Provenance in 2007

19. On or about February 2007, the Antiquities Dealer agreed to sell the Gilgamesh Dream Tablet to two antiquities buyers for $50,000. A preliminary translation by the Cuneiform Expert was included in the sale. At the time of the sale, the Antiquities Dealer did not supply a provenance. However, one of the buyers requested a provenance from the Antiquities Dealer when he picked up the Gilgamesh Dream Tablet.

20. In or around March 2007, the Antiquities Dealer created a false provenance (the "False Provenance Letter") that omitted any mention of Rihani or the United

6

Kingdom.  The False Provenance Letter indicated that the Gilgamesh Dream Tablet was purchased at a 1981 Butterfield & Butterfield auction in San Francisco as part of lot 1503. According to the False Provenance Letter, lot 1503 consisted of "miscellaneous objects including several other antiquities, none of them completely described."  The False Provenance Letter further stated that "[a]t the time, this was said to have been deaccessioned from a small museum."  The Butterfield & Butterfield's 1981 auction catalog describes lot 1503 as "box of miscellaneous ancient bronze fragments."

21.  After the Antiquities Dealer sold the Gilgamesh Dream Tablet, one of the two buyers published the Gilgamesh Dream Tablet in a catalog associated with his business, stating that the provenance was "clean" as the piece had been with a single U.S. owner for the past 25 years.

22.  After the March 2007 sale, the Gilgamesh Dream Tablet was also published in a catalog issued by Michael Sharpe Rare & Antiquated Books ("Michael Sharpe").  In the Michael Sharpe catalog, the Gilgamesh Dream Tablet was described as "manuscript in cuneiform, Mesopotamia, c. 1400 BC" and more specifically as a "[l]arge baked clay tablet fragment from the Middle Babylonian period."  The catalog mentioned that sale would include the Professor's analysis, the Cuneiform Expert's authentication and "a clear provenance."

23.  In or about 2007, the Professor's translation and study of the Gilgamesh Dream Tablet was published in *Revue d'Assyriologie et d'archéologie orientale*, a French journal in the field of cuneiform epigraphy.

The Auction House's Private Sale of the Gilgamesh Dream Tablet to Hobby Lobby in 2014

24. In or about December 2013, a new owner of the Gilgamesh Dream Tablet contacted the London office of a major international auction house (the "Auction House") seeking to consign the Gilgamesh Dream Tablet to the Auction House for a private sale.

25. On or about December 18, 2013, an Auction House administrator contacted the Antiquities Dealer by email and requested confirmation of the provenance.

26. On or about December 23, 2013, the Antiquities Dealer called the Auction House and spoke by telephone with the then-head of their Antiquities Department (the "Former Antiquities Department Head"). The Former Antiquities Department Head stated that he or she was contacting the Antiquities Dealer to verify the provenance of the Gilgamesh Dream Tablet. The Antiquities Dealer responded that the provenance was not verifiable and would not hold up to scrutiny in a public auction. The Former Antiquities Department Head advised the Antiquities Dealer that it would not be offered in a public auction, but a private sale. No further inquiries were made about the provenance during this call.

27. In or about March 2014, the Auction House offered the Gilgamesh Dream Tablet to a representative of the Green Collection/Museum of the Bible ("MOTB"). The MOTB representative viewed the Gilgamesh Dream Tablet in London.

28. No later than July 2014, Hobby Lobby Stores Inc. ("Hobby Lobby"), which purchased artifacts for donation to or display at the MOTB, agreed to pay the Auction House $1,674,000 for the Gilgamesh Dream Tablet. In or around July 2014, the Auction House shipped the Gilgamesh Dream Tablet to their New York office. It was later hand-

8

carried by an Auction House representative to Hobby Lobby in Oklahoma City, Oklahoma so that Hobby Lobby could avoid incurring a New York sales tax.

29. On or about July 22, 2014, the MOTB's registrar noted in an email to the Auction House that the invoice prepared by the Auction House did not include "the date or country of origin" for the Gilgamesh Dream Tablet and asked for the invoice to be revised. The registrar also asked for a copy of the "auction listing" for the Gilgamesh Dream Tablet for their files.

30. On or about July 23, 2014, an Auction House business manager advised the Former Antiquities Department Head by email that per the MOTB registrar's request, the invoice would be changed to list Iraq as the country of origin and the date as circa 1600 B.C. The Auction House's business manager asked the Former Antiquities Department Head if the Butterfield & Butterfield reference could be supplied as the auction listing.

31. On or about the same date, the Auction House's Former Antiquities Department Head responded to the business manager that the country of origin and date were correct. He or she also stated as follows:

> Here is the provenance for the tablet. The person who bought it in the Butterfield[']s sale <u>told us</u> it was part of lot 1503 and that it was heavily encrusted with salts and unreadable. [He or She] <u>also mentioned</u> that at the time, it was said to have been de-accessioned from a small museum. Unfortunately Bonham and Butterfield no longer have their consignor records so we could not corroborate this further. It was subsequently with Michael Sharp[e] - catalogue entry attached.
>
> (Emphases added)

9

32. The Antiquities Dealer denies confirming any of the details in the False Provenance Letter to the Former Antiquities Department Head.

33. The Auction House amended the invoice to include the tablet's country of origin and approximate date of manufacture. The final invoice for the purchase listed the Gilgamesh Dream Tablet as "A Mesopotamian Cuneiform Tablet, bearing part of the Epic of Gilgamesh" and added "Iraq, circa 1600 B.C."

34. On or about July 24, 2014, an Auction House employee ("the Auction House Employee #1") emailed representatives of Hobby Lobby and the MOTB stating as follows:

> Here is the revised invoice for the Gilgamesh tablet, stating its place of creation and date.
>
> Regarding earlier provenance:
>
> We can safely say it left Iraq before 1981 as that is the date it was sold in a Butterfield's auction in San Francisco. The person who bought it in the Butterfields sale <u>told us</u> it was part of lot 1503 and that it was heavily encrusted with salts and unreadable. [He or She] <u>also mentioned</u> that at the time, it was said to have been de-accessioned from a small museum, and so in all likelihood it was in the US well before 1981. Unfortunately Butterfields no longer have their consignor records so we could not corroborate this further. It was subsequently with Michael Sharp[e].

(Emphases added)

35. On or about the same date, Auction House Employee #1 sent copies of the Butterfield auction catalog entry for lot 1503 and the Michael Sharpe catalog entry regarding the Gilgamesh Dream Tablet by email to the MOTB registrar.

36. On or about the same date, a representative of Hobby Lobby signed the revised invoice to purchase the Gilgamesh Dream Tablet through the Auction House in a private sale.

37. On or about July 30, 2014, Hobby Lobby wired $1,674,000 to the Auction House as payment for the Gilgamesh Dream Tablet.

38. At no time did the Auction House provide to Hobby Lobby or the MOTB a copy of the False Provenance Letter created by the Antiquities Dealer that identified lot 1503 of the 1981 Butterfield auction as the source of the Gilgamesh Dream Tablet. Nor did the Auction House list the Antiquities Dealer as a former owner of the Gilgamesh Dream Tablet in any materials or information they provided to Hobby Lobby or the MOTB.

MOTB's Inquiries with the Auction House to Confirm Provenance in 2017

39. Approximately three years later, on or about October 23, 2017, a curator at the MOTB conducting due diligence research contacted the Antiquities Dealer by email and asked if the Antiquities Dealer had a copy of the provenance.

40. On or about October 24, 2017, the same MOTB curator contacted Auction House Employee #1 by email and advised that he was conducting provenance research about the Gilgamesh Dream Tablet. Among the questions the curator asked were whether the Auction House had and could provide a copy of the Cuneiform Expert's authentication and provenance mentioned in the Michael Sharpe catalog, and who owned the Gilgamesh Dream Tablet before Michael Sharpe.

41. On or about the same date, Auction House Employee #1 responded to the MOTB curator by email, copying and introducing the new Head of the Antiquities

11

Department in London (the "New Antiquities Department Head") "who can help answer your questions and will happily provide as much about the provenance as we are able."

42. On or about October 25, 2017, the New Antiquities Department Head sent an email to the International Head of the Auction House's antiquities department (the "International Head") stating in part, "I was surprised the [Antiquities Dealer] name does not appear in the provenance although [the Antiquities Dealer] did buy it in the 1981 auction." In the email, the New Antiquities Department Head noted that the Antiquities Dealer's provenance letter (identified herein as the False Provenance Letter) "apparently was not sent to the Bible Museum." The New Antiquities Department Head asked whether he or she should contact the Former Antiquities Department Head to find out if there was a reason the Antiquities Dealer's name or letter was not disclosed.

43. On or about October 26, 2017, the New Antiquities Department Head sent an email to the International Head stating in part:

> The prov 'should' read
> [1] Butterfield auction . . . 1981
> [2] [Antiquities Dealer and Cuneiform Expert] acquired from
>     the above.
> [3] Michael Sharpe, acq from the above in 2007.
> [4] Private collection (the vendor), acq from the above (but I
>     don't know when).
>
> Instead there was only line 1 and 3.
>
> I think I should ask [the Former Antiquities Department Head],
> but wanted to make sure with you that it was appropriate.

44. On or about October 27, 2017, the Antiquities Dealer responded by email to the MOTB curator, stating that he or she no longer had any records related to the Gilgamesh Dream Tablet.

12

45. On or about the same date, another MOTB curator contacted the Professor, writing, in part:

> I am writing to ask if you could provide any more information on [the Gilgamesh Dream Tablet's] history, as my institution recently purchased it at auction and are trying to work out some provenance issues. Unfortunately, there are some inaccuracies in the [Auction House] material and I am trying to get to the bottom of it all.

As noted above, Hobby Lobby purchased the Gilgamesh Dream Tablet in a private sale. The MOTB did not purchase it at auction.

46. On or about October, 30, 2017, the New Antiquities Department Head sent an email to the Antiquities Dealer stating, in part:

> We have recently been contacted by the present owner with a question in regards to the tablet. As you know, an identification and statement of provenance are mentioned by Michael Sharpe in his Catalog No. 1 (dated to 2007 I believe) and the present owner is asking if a copy can be sent to him. I therefore wanted to ask you if you would agree for us to forward these two documents on.

47. The Antiquities Dealer did not respond to this email.

48. On or about October 31, 2017, a collections director at MOTB contacted Auction House Employee #1 noting that the New Antiquities Department Head indicated that he or she would not be available until November 7, 2017 and requesting assistance in the interim. The MOTB collections director wrote, in part:

> We are, however, in a difficult situation. As we reviewed again our provenance documentation on this item, we discovered that we could not confirm that it was in the US in 1981. The earliest that we are able to document is 2005. This puts us in a very difficult situation, with the museum opening on November 18 and installations taking place at this moment.

49. On or about the same date, Auction House Employee #2 sent an email to Auction House Employee #1 attaching the Cuneiform Expert's certificate of authenticity, the 1981 Butterfield auction catalog and a corresponding invoice showing payment for several lots, including lot 1503. The copy of the invoice concealed the Antiquities Dealer's name as the buyer. Auction House Employee #1 then forwarded these attachments to representatives of the MOTB.

50. On or about the same date, an MOTB collections director responded to Auction House Employee #1, "The identification in the catalog is clearly a mistake. This is not a bronze fragment and could not be mistaken for one. . . . What do we do in such a case? We have no history of ownership beyond the [Auction House] sale."

51. On or about the same date, the Auction House's New Antiquities Department Head sent an email to Auction House Employees #1 and #2 writing, in part:

> The lot is vaguely described, but it is not unusual for this [sic] type of objects. It was a box of miscellan[e]ous, mainly of bronze, and contained the tablet as well. The [Antiquities Dealer and Cuneiform Expert] bought the lot because of the presence of the tablet in it and <u>confirmed it to us</u>.
>
> This had been cleared by Legal at the time.
>
> (Emphasis added)

52. The Antiquities Dealer denies confirming the provenance or any details contained therein in any communications with Auction House employees.

14

## CLAIM FOR RELIEF

53. Plaintiff repeats the allegations of paragraphs 1 through 52 as if fully set forth herein.

54. The Defendant *in rem* is stolen Iraqi property which was introduced or attempted to be introduced into the United States in violation of Title 18, United States Code, Section 2314.

55. As a result of the foregoing, the Defendant *in rem* is liable to condemnation and to forfeiture to the United States, in accordance with Title 19, United States Code, Section 1595a(c)(1)(A).

WHEREFORE, plaintiff, United States of America, requests that a warrant of this Court be issued for the arrest of the Defendant *in rem*; that due notice of these proceedings be given to all interested persons; that the Defendant *in rem* be forfeited and condemned to the use of the United States of America; that the plaintiff be awarded its costs

and disbursements in this action; and for such other relief and further relief as this Court deems just and proper.

Dated: Brooklyn, New York
May 18, 2020

                                      RICHARD P. DONOGHUE
                                      United States Attorney
                                      Eastern District of New York
                                      271 Cadman Plaza East
                                      Brooklyn, New York 11201

                            By:        /s/
                                        Karin Orenstein
                                        Assistant U.S. Attorney
                                        (718) 254-6188

Of Counsel:

Ann Brickley
Trial Attorney
Money Laundering and Asset Recovery Section
U.S. Department of Justice

Zia M. Faruqui
Assistant U.S. Attorney
U.S. Attorney's Office, District of Columbia

**Exhibit A**
Image of the Defendant *in rem*



## VERIFICATION

JOHN PAUL LABBAT, hereby declares as follows:

1. I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations.

2. I have read the within verified complaint *in rem* and know the contents thereof.

3. I believe the matters contained in the within verified complaint *in rem* are true and accurate to the best of my knowledge, information and belief.

4. The source of my information and the grounds for my belief are personal knowledge and information provided by other law enforcement officers and the official files and records of the United States of America.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:   Brooklyn, New York
         May 7, 2020

_____
John Paul Labbat
Special Agent
U.S. Department of Homeland Security,
Homeland Security Investigations