BDM:SSS
F. #2019V02611

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA,

                Plaintiff,

    – against –

ONE CUNEIFORM TABLET KNOWN AS
THE "GILGAMESH DREAM TABLET,"

          Defendant *in rem*.

– – – – – – – – – – – – – – – – – – – – – X

**AMENDED VERIFIED
COMPLAINT *IN REM***

Docket No. 20-CV-2222
(Donnelly, J.) (Kuo, M.J.)

Plaintiff, United States of America, by its attorneys, JACQUELYN M.

KASULIS, Acting United States Attorney for the Eastern District of New York, and DEBORAH

CONNOR, Chief of the Money Laundering and Asset Recovery Section of the U.S. Department

of Justice, for its Amended Verified Complaint *in rem*, hereby alleges upon information and

belief as follows:

## PRELIMINARY STATEMENT

1.      Plaintiff brings this action *in rem* to condemn and forfeit to the use and

benefit of the United States the above-captioned property pursuant to 19 U.S.C.

§ 1595a(c)(1)(A), as stolen Iraqi property that was introduced or attempted to be introduced into

the United States contrary to 18 U.S.C. §§ 545 and 2314; and pursuant to 19 U.S.C. § 2609 as

designated archaeological or ethnological material or an article of cultural property exported

from Iraq contrary to 19 U.S.C. § 2606.

**DEFENDANT *IN REM***

2.     The Defendant *in rem* is a cuneiform tablet bearing part of the Epic of Gilgamesh (the "Gilgamesh Dream Tablet").  Cuneiform is an ancient system of writing on clay tablets that was used in ancient Mesopotamia thousands of years ago.  These clay tablets were generally not baked or fired in antiquity and must be handled carefully to avoid damage.

3.     Cuneiform tablets have been the subject of substantial looting in Iraq. Hundreds of thousands of objects are estimated to have been looted from archaeological sites throughout Iraq since the early 1990s.  Cuneiform tablets comprise one of most popular types of looted Iraqi artifacts on the antiquities market.

4.     The epic of Gilgamesh is a Sumerian poem written in cuneiform.  Scholars first discovered the epic in 1853, when a 12-tablet Babylonian version, written in Akkadian, was found in the ruins of the library of the Assyrian King Assur Banipal in Nineveh (located in modern-day northern Iraq).  The events in the epic revolve around King Gilgamesh of Uruk (located in modern-day southern Iraq).  The epic is considered one of the world's oldest works of narrative poetry.  Since the epic's discovery in 1853, additional copies or versions of the epic have been found on ancient cuneiform tablets.

5.     The Defendant *in rem* measures approximately 6" by 5" and is written in the Akkadian language.  It is known as the "Gilgamesh Dream Tablet" because it contains a portion of the epic of Gilgamesh in which the protagonist describes his dreams to his mother and she interprets them as foretelling the arrival of a new friend.  She tells the protagonist, "You will see him and your heart will laugh."  The names of the hero, Gilgamesh, and the character who becomes his friend, Enkidu, are replaced in this tablet with the names of deities Sin and Ea.

6.      On or about September 24, 2019, the Defendant *in rem* was seized from

the Museum of the Bible ("MOTB") in Washington, D.C., by agents of the Department of

Homeland Security, Homeland Security Investigations ("HSI").  On or about the same date, HSI

agents transferred custody of the Defendant *in rem* to U.S. Customs and Border Protection

("CBP"), which is currently storing the Defendant *in rem* in Brooklyn, New York.

7.      A photograph of the Defendant *in rem* is attached as Exhibit A.

## JURISDICTION AND VENUE

8.      This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345

and 1355.

9.      Venue in the Eastern District of New York is proper, pursuant to Title 28,

United States Code, Sections 1355(b)(1)(B) and 1395(b), in that the Defendant *in rem* is

presently located in Brooklyn, New York, which lies within the Eastern District of New York.

## STATUTORY FRAMEWORK

Applicable Forfeiture Law

10.     Title 19, United States Code, Section 1595a(c)(1)(A) provides in pertinent

part that "[m]erchandise which is introduced or attempted to be introduced into the United States

contrary to law . . . shall be seized and forfeited if it . . . is stolen, smuggled, or clandestinely

imported or introduced." *Id*.

11.     Merchandise is introduced or attempted to be introduced "contrary to law"

within the meaning of Section 1595a(c)(1)(A) if the importation violates Title 18, United States

Code, Section 2314.  This Section provides in pertinent part:

> Whoever transports, transmits, or transfers in interstate or foreign
> commerce any goods, wares [or] merchandise . . . of the value of

3

> $5,000 or more, knowing the same to have been stolen, converted
> or taken by fraud

violates the law.

13. Cultural property is considered "stolen" under Title 19, United States

Code, Section 1595a(c)(1)(A), and Title 18, United States Code, Section 2314, if it was taken

without official authorization from a foreign country whose laws establish state ownership of

such cultural property.

13. Merchandise is introduced or attempted to be introduced "contrary to law"

within the meaning of Section 1595a(c)(1)(A) if the importation violates Title 18, United States

Code, Section 545.  This Section provides in pertinent part:

> Whoever knowingly and willfully, with intent to defraud the
> United States, smuggles, or clandestinely introduces or attempts to
> smuggle or clandestinely introduce into the United States any
> merchandise which should have been invoiced . . . ; or
>
> Whoever fraudulently or knowingly imports or brings into the
> United States, any merchandise contrary to law, . . . or in any
> manner facilitates the transportation, concealment, or sale of such
> merchandise after importation, knowing the same to have been
> imported or brought into the United States contrary to law

violates the law.

14. Any designated archaeological or ethnological material or article of

cultural property may be seized and forfeited under Title 19, United States Code, Section 2609, if

the importation of the items violates Title 19, United States Code, Section 2606.  The Section

provides in pertinent part:

> No designated archaeological or ethnological material that is
> exported (whether or not such exportation is to the United States)
> from the State Party after the designation of such material under
> Section 2604 of this title may be imported into the United States
> unless the State Party issues a certification or other documentation

which certifies that such exportation was not in violation of the
laws of the State Party.

Legal Protections for Iraqi Cultural Property

15.     U.S. Prohibitions on Importation.  The importation of Iraqi cultural

property into the United States has been restricted since 1990, when the United States

implemented a general ban on the importation of any Iraqi goods via the Iraqi Sanctions

Regulations, codified at Title 31, Code of Federal Regulations, Part 575.  In 2004, Title 31, Code

of Federal Regulations, Section 575.533 was amended to lift the general ban while retaining

more limited restrictions, including a ban on the importation of "Iraqi cultural property or other

items of archaeological, historical, cultural, rare scientific, and religious importance illegally

removed from the Iraq National Museum, the National Library, and other locations in Iraq since

August 6, 1990."  Pursuant to Section 575.533(b)(4), "[a]ny trade in or transfer of such items,

including items with respect to which reasonable suspicion exists that they have been illegally

removed" remains prohibited.  In 2010, the Iraqi Sanctions Regulations were repealed and

replaced with the Iraq Stabilization and Insurgency Sanctions Regulations, codified at Title 31,

Code of Federal Regulations, Part 576.  In particular, Section 576.208 prohibits "the trade in or

transfer of ownership or possession of Iraqi cultural property or other items of archeological,

historical, cultural, rare scientific, and religious importance that were illegally removed, or for

which a reasonable suspicion exists that they were illegally removed, from the Iraq National

Museum, the National Library, and other locations in Iraq since August 6, 1990."  The regulation

incorporates the criminal and civil penalties set forth in the International Emergency Economic

Powers Act (codified at Title 50, United States Code, Section 1705).

16.     In 2004, Congress passed the Emergency Protection for Iraqi Cultural

Antiquities Act of 2004 (the "Act") allowing the President to exercise his or her authority under

5

19 U.S.C. §§ 2603 *et seq.* "with respect to archaeological or ethnological material of Iraq . . . ."

Pub. L. 108-429 §§ 3001-3003).  The Act defined archaeological or ethnological material of Iraq

as "cultural property of Iraq and other items of archaeological, historical, cultural, rare scientific

or religious importance illegally removed from . . . locations in Iraq, since the adoption of United

Nations Security Council Resolution 661 of 1990." *Id.*  Thus, Iraq is a "State Party" under Title

19, United States Code, Section 2606.

17.     On April 30, 2008, CBP amended 19 C.F.R. Part 12 to reflect the

imposition of import restrictions on Iraqi archaeological and ethnological materials.  19 C.F.R.

§ 12.104j.  CBP decision 08-17 identifies ceramics and cuneiform tablets, among other items, as

archaeological and ethnological material of Iraq.  19 C.F.R § 12, appx. 14B6-19.

18.     Iraqi Patrimony Law.  Under Article 3 of Iraq's Antiquities Law No. 59 of

1936 (as amended in 1974 and 1975), all antiquities found in Iraq, whether movable or

immovable, on or under the ground, are considered property of the state.  Under Article 16 of

Antiquities Law No. 59, private persons generally cannot possess antiquities.  Where private

possession is authorized, the antiquities must be registered with the government and may only be

transferred to another Iraqi party with government approval.  Article 26 of Antiquities Law No.

59 prohibits the export of Iraqi antiquities.  The law's definition of "antiquities" includes

movable possessions which were made, produced, sculpted, written or drawn by man and which

are at least 200 years old.  In 2002, Iraq issued the Antiquities and Heritage Law, Law No. 55 of

2002, which contains similar provisions.

**FACTUAL BACKGROUND**

Purchase and Importation of the Gilgamesh Dream Tablet in 2003

19.     In or about 2001, a U.S. antiquities dealer (the "Antiquities Dealer")

viewed cuneiform tablets on the floor of an apartment in London, England.  The displayed items

belonged to a Jordanian coins dealer, Ghassan Rihani.  The Antiquities Dealer knew Rihani as a

source of supply for Middle Eastern antiquities who obtained antiquities directly from the

Middle East.  According to public reports, Rihani died in 2001.

20.     In or about March or April 2003, the Antiquities Dealer and an expert in

cuneiform (the "Cuneiform Expert") visited Rihani's London apartment.  During this visit, they

met with one of Rihani's family members and viewed the cuneiform tablets on the floor.  The

tablets, including the Defendant *in rem*, had not been conserved.  They did not appear to be the

types of cuneiform tablets more typically found that report on economic or other mundane

events.  Rather, the cuneiform writing appeared denser and potentially of a literary nature.

Among these was a partial tablet that was not readable due to encrustations on the surface.  The

Antiquities Dealer and Cuneiform Expert decided that although they were unreadable, these

cuneiform tablets, which included the Defendant *in rem*, were potentially rare and valuable.

They agreed to pay $50,350 for a number of items, including all of the tablets, and shipped the

purchased items from London to the Cuneiform Expert's address in the United States by

international post.

21.     Goods shipped into the United States from overseas must comply with

U.S. law.  In 2003, goods with a value exceeding $2,000 required formal entry with CBP.  In

2014, goods with a value exceeding $2,500 required formal entry with CBP.  Formal entry

required the shipper to provide specific information about the merchandise, including the

Customs classification code (harmonized tariff code), the merchandise's country of origin,

description of the merchandise, quantity of the merchandise, value of the merchandise and the

weight of the merchandise.

22.    When shipping the Defendant *in rem* and other items from the United

Kingdom to the United States, the Cuneiform Expert believes that he or she attached an

international Customs label to the package and indicated that it contained inscribed clay

fragments over 100 years old.  The Cuneiform Expert believes that he or she did not file a formal

entry with U.S. Customs or identify the shipment as containing antiquities or Iraqi goods.

23.    An HSI agent queried a CBP database for import and export entries for the

Cuneiform Expert and the Antiquities Dealer and found no formal entry of cuneiform tablets in

2003.

24.    After receiving the tablets by mail in the United States, the Cuneiform

Expert preserved the partial tablet by baking and cleaning it and removing encrusted material

from its surface.  The Cuneiform Expert then read the cuneiform writing on the tablet and

identified it as part of the epic of Gilgamesh.

25.    In or about March 2005, the Cuneiform Expert shipped the Gilgamesh

Dream Tablet across state lines from California to Princeton, New Jersey, where it was studied

by a professor (the "Professor").  The Professor received the tablet and studied it in Princeton,

New Jersey, for a few weeks.

Sale of the Gilgamesh Dream Tablet with a False Provenance in 2007

26.    On or about February 2007, the Antiquities Dealer agreed to sell the

Gilgamesh Dream Tablet to two antiquities buyers for $50,000.  A preliminary translation by the

Cuneiform Expert was included in the sale.  At the time of the sale, the Antiquities Dealer did

not supply a provenance.  However, one of the buyers requested a provenance from the

Antiquities Dealer when he or she picked up the Gilgamesh Dream Tablet.

27.     In or about March 2007, the Antiquities Dealer created a false provenance

(the "False Provenance Letter") that omitted any mention of Rihani or the United Kingdom.  The

False Provenance Letter indicated that the Gilgamesh Dream Tablet was purchased at a 1981

Butterfield & Butterfield auction in San Francisco as part of lot 1503.  According to the False

Provenance Letter, lot 1503 consisted of "miscellaneous objects including several other

antiquities, none of them completely described."  The False Provenance Letter further stated that

"[a]t the time, this was said to have been deaccessioned from a small museum."  The Butterfield

& Butterfield's 1981 auction catalog describes lot 1503 as "box of miscellaneous ancient bronze

fragments."

28.     After the Antiquities Dealer sold the Gilgamesh Dream Tablet, one of the

two buyers published the Gilgamesh Dream Tablet in a catalog associated with his business,

stating that the provenance was "clean" as the piece had been with a single U.S. owner for the

past 25 years.

29.     After the March 2007 sale, the Gilgamesh Dream Tablet was also

published in a catalog issued by Michael Sharpe Rare & Antiquarian Books ("Michael Sharpe").

In the Michael Sharpe catalog, the Gilgamesh Dream Tablet was described as "manuscript in

cuneiform, Mesopotamia, c. 1400 BC" and more specifically as a "[l]arge baked clay tablet

fragment from the Middle Babylonian period."  The catalog mentioned that a sale of the

Gilgamesh Dream Tablet would include the Professor's analysis, the Cuneiform Expert's

authentication and "a clear provenance."

30.     In or about 2007, the Professor's translation and study of the Gilgamesh

Dream Tablet was published in *Revue d'assyriologie et d'archéologie orientale*, a French journal

in the field of cuneiform epigraphy.

The Auction House's Private Sale of the Gilgamesh Dream Tablet to Hobby Lobby in 2014

31.     In or about December 2013, a new owner of the Gilgamesh Dream Tablet

(the "Consignor") contacted the London office of a major international auction house (the

"Auction House") seeking to consign the Gilgamesh Dream Tablet to the Auction House for a

private sale.

32.     On or about December 18, 2013, an Auction House administrator

contacted the Antiquities Dealer by email and requested confirmation of the provenance.

33.     On or about January 2, 2014, the Antiquities Dealer called the Auction

House and spoke by telephone with the then-head of their Antiquities Department (the "Former

Antiquities Department Head").  The Former Antiquities Department Head stated that he or she

was contacting the Antiquities Dealer to verify the provenance of the Gilgamesh Dream Tablet.

The Antiquities Dealer responded that the provenance was not verifiable and would not hold up

to scrutiny in a public auction.  The Former Antiquities Department Head advised the Antiquities

Dealer that the Gilgamesh Dream Tablet would not be offered in a public auction, but may be

offered in a private sale.  No further inquiries were made about the provenance during this call.

34.     In or about March 2014, the Auction House offered the Gilgamesh Dream

Tablet to a representative of the MOTB.  The MOTB representative viewed the Gilgamesh

Dream Tablet in London.

35.     On or about July 2, 2014, the Consignor provided the Auction House with

a Provenance and Country of Origin Declaration which stated that the Gilgamesh Dream

Tablet's country of origin was Iraq and that it had been imported into the United Kingdom on

March 17, 2009.  It listed the Gilgamesh Dream Tablet's provenance as:

> Anonymous sale: *Oriental Works of Art, European Furniture and Decorations;* Butterfield and Butterfield, San Francisco, 20 August, 1981, lot 1503 (part lot).
> with Michael Sharpe Rare and Antiquarian Books, Pasadena, California, 2007.
> * * *
> I hereby declare that the property was exported from the Country of Origin (as stated above) before 1st January 2000.

36.     On or about July 11, 2014, an Auction House employee flew to the United

States with the Gilgamesh Dream Tablet and transported it to the Auction House's office in New

York City.

37.     On or about July 14, 2014, the Auction House provided Hobby Lobby

Stores Inc. ("Hobby Lobby") with an invoice for the Gilgamesh Dream Tablet with a sales price

of $1,674,000.  Hobby Lobby purchased the Gilgamesh Dream Tablet for donation to, or display

at, the MOTB.  It was later hand-carried by an Auction House representative to Hobby Lobby in

Oklahoma City, Oklahoma, so that Hobby Lobby could avoid incurring New York sales tax.

38.     On or about July 22, 2014, the MOTB's registrar noted in an email to the

Auction House that the invoice prepared by the Auction House did not include "the date or

country of origin" for the Gilgamesh Dream Tablet and asked for the invoice to be revised.  The

registrar also asked for a copy of the "auction listing" for the Gilgamesh Dream Tablet for the

MOTB files.

39.     On or about July 23, 2014, an Auction House business manager advised

the Former Antiquities Department Head by email that, at the MOTB registrar's request, the

invoice would be changed to list Iraq as the country of origin and the date as circa 1600 B.C.

The Auction House's business manager asked the Former Antiquities Department Head if the

Butterfield & Butterfield reference could be supplied as the auction listing.

40.     On or about the same date, the Auction House's Former Antiquities

Department Head responded to the business manager that the country of origin and date were

correct.  He or she also stated as follows:

> Here is the provenance for the tablet. The person who bought it in
> the Butterfield[']s sale *told us* it was part of lot 1503 and that it
> was heavily encrusted with salts and unreadable. [He or She] *also
> mentioned* that at the time, it was said to have been de-accessioned
> from a small museum. Unfortunately Bonham and Butterfield no
> longer have their consignor records so we could not corroborate
> this further. It was subsequently with Michael Sharp[e] - catalogue
> entry attached.

(Emphases added)

41.     The Antiquities Dealer denies confirming any of the details in the False

Provenance Letter to the Former Antiquities Department Head.

42.     The Auction House amended the invoice to include the tablet's country of

origin and approximate date of creation.  The final invoice for the purchase listed the Gilgamesh

Dream Tablet as "A Mesopotamian Cuneiform Tablet, bearing part of the Epic of Gilgamesh"

and added "Iraq, circa 1600 B.C."

43.     On or about July 24, 2014, an Auction House employee (the "Auction

House Employee #1") emailed representatives of Hobby Lobby and the MOTB stating as

follows:

> Here is the revised invoice for the Gilgamesh tablet, stating its
> place of creation and date.
>
> Regarding earlier provenance:
>
> We can safely say it left Iraq before 1981 as that is the date it was
> sold in a Butterfield's auction in San Francisco. The person who
> bought it in the Butterfields sale *told us* it was part of lot 1503 and

12

that it was heavily encrusted with salts and unreadable. [He or She] *also mentioned* that at the time, it was said to have been de-accessioned from a small museum, and so in all likelihood it was in the US well before 1981. Unfortunately Butterfields no longer have their consignor records so we could not corroborate this further. It was subsequently with Michael Sharp[e].

(Emphases added)

44.     On or about the same date, Auction House Employee #1 sent copies of the Butterfield & Butterfield auction catalog entry for lot 1503 and the Michael Sharpe catalog entry regarding the Gilgamesh Dream Tablet by email to the MOTB registrar.

45.     On or about the same date, a representative of Hobby Lobby signed the revised invoice to purchase the Gilgamesh Dream Tablet through the Auction House in a private sale.

46.     On or about July 30, 2014, Hobby Lobby wired $1,674,000 to the Auction House as payment for the Gilgamesh Dream Tablet.

47.     At no time did the Auction House provide to Hobby Lobby or the MOTB a copy of the False Provenance Letter created by the Antiquities Dealer that identified lot 1503 of the 1981 Butterfield & Butterfield auction as the source of the Gilgamesh Dream Tablet.  Nor did the Auction House list the Antiquities Dealer as a former owner of the Gilgamesh Dream Tablet in any materials or information it provided to Hobby Lobby or the MOTB despite having discussed with the Antiquities Dealer his or her prior ownership of the Gilgamesh Dream Tablet.

MOTB's Inquiries with the Auction House to Confirm Provenance in 2017

48.     Approximately three years later, on or about October 23, 2017, a curator at the MOTB conducting due diligence research contacted the Antiquities Dealer by email and asked if the Antiquities Dealer had a copy of the provenance.

49.     On or about October 24, 2017, the same MOTB curator contacted Auction House Employee #1 by email and advised that he was conducting provenance research about the Gilgamesh Dream Tablet.  Among the questions the curator asked were whether the Auction House had and could provide a copy of the Cuneiform Expert's authentication and provenance mentioned in the Michael Sharpe catalog, and identify who owned the Gilgamesh Dream Tablet before Michael Sharpe.

50.     On or about the same date, Auction House Employee #1 responded to the MOTB curator by email, copying and introducing the newly appointed Head of the Antiquities Department in London (the "New Antiquities Department Head") "who can help answer your questions and will happily provide as much about the provenance as we are able."

51.     On or about October 25, 2017, the New Antiquities Department Head sent an email to the International Head of the Auction House's antiquities department (the "International Head") stating in part, "I was surprised the [Antiquities Dealer's] name does not appear in the provenance although [the Antiquities Dealer] did buy it in the 1981 auction."  In the email, the New Antiquities Department Head noted that the Antiquities Dealer's provenance letter (identified herein as the False Provenance Letter) "apparently was not sent to the Bible Museum."  The New Antiquities Department Head asked whether he or she should contact the Former Antiquities Department Head to find out if there was a reason the Antiquities Dealer's name or letter was not disclosed.

52.     On or about October 26, 2017, the New Antiquities Department Head sent an email to the International Head stating in part:

> The prov 'should' read
> [1] Butterfield auction . . . 1981
> [2] [Antiquities Dealer and Cuneiform Expert] acquired from the
>      above.

[3] Michael Sharpe, acq from the above in 2007.
[4] Private collection (the vendor), acq from the above (but I don't
     know when).

Instead there was only line 1 and 3.

I think I should ask [the Former Antiquities Department Head], but
wanted to make sure with you that it was appropriate.

53.     On or about October 27, 2017, the Antiquities Dealer responded by email

to the MOTB curator, stating that he or she no longer had any records related to the Gilgamesh

Dream Tablet.

54.     On or about the same date, another MOTB curator contacted the

Professor, writing, in part:

I am writing to ask if you could provide any more information on
[the Gilgamesh Dream Tablet's] history, as my institution recently
purchased it at auction and are trying to work out some provenance
issues. Unfortunately, there are some inaccuracies in the [Auction
House] material and I am trying to get to the bottom of it all.

As noted above, Hobby Lobby purchased the Gilgamesh Dream Tablet in a private sale.  The

MOTB did not purchase it at auction.

55.     On or about October 30, 2017, the New Antiquities Department Head sent

an email to the Antiquities Dealer stating, in part:

We have recently been contacted by the present owner with a
question in regards to the tablet. As you know, an identification
and statement of provenance are mentioned by Michael Sharpe in
his Catalog No. 1 (dated to 2007 I believe) and the present owner
is asking if a copy can be sent to him. I therefore wanted to ask you
if you would agree for us to forward these two documents on.

56.     The Antiquities Dealer did not respond to this email.

57.     On or about October 31, 2017, a collections director at MOTB contacted

Auction House Employee #1 noting that the New Antiquities Department Head indicated that he

15

or she would not be available until November 7, 2017, and requested assistance in the interim. The MOTB collections director wrote, in part:

> We are, however, in a difficult situation. As we reviewed again our provenance documentation on this item, we discovered that we could not confirm that it was in the US in 1981. The earliest that we are able to document is 2005. This puts us in a very difficult situation, with the museum opening on November 18 and installations taking place at this moment.

58.     On or about the same date, another Auction House employee ("Auction House Employee #2") sent an email to Auction House Employee #1 attaching the Cuneiform Expert's certificate of authenticity, the 1981 Butterfield & Butterfield auction catalog and a corresponding invoice showing payment for several lots, including lot 1503.  The copy of the invoice concealed the Antiquities Dealer's name as the buyer.  Auction House Employee #1 then forwarded these attachments to representatives of the MOTB.

59.     On or about the same date, an MOTB collections director responded to Auction House Employee #1, "The identification in the catalog is clearly a mistake.  This is not a bronze fragment and could not be mistaken for one. . . .  What do we do in such a case?  We have no history of ownership beyond the [Auction House] sale."

60.     On or about the same date, the Auction House's New Antiquities Department Head sent an email to Auction House Employee #1 and Auction House Employee #2 writing, in part:

> The lot is vaguely described, but it is not unusual for this [sic] type of objects. It was a box of miscellan[e]ous, mainly of bronze, and contained the tablet as well. The [Antiquities Dealer and Cuneiform Expert] bought the lot because of the presence of the tablet in it and *confirmed it to us*.
>
> This had been cleared by Legal at the time.

(Emphasis added)

61.     The Antiquities Dealer denies confirming the provenance or any details

contained therein in any communications with Auction House employees.

## FIRST CLAIM FOR RELIEF

62.     Plaintiff repeats the allegations of paragraphs 1 through 61 as if fully set

forth herein.

63.     The Defendant *in rem* was introduced or attempted to be introduced into

the United States in violation of Title 18, United States Code, Section 545.

64.     As a result of the foregoing, the Defendant *in rem* is liable to

condemnation and to forfeiture to the United States, in accordance with Title 19, United States

Code, Section 1595a(c)(1)(A).

## SECOND CLAIM FOR RELIEF

65.     Plaintiff repeats the allegations of paragraphs 1 through 61 as if fully set

forth herein.

66.     The Defendant *in rem* is stolen Iraqi property which was introduced or

attempted to be introduced into the United States in violation of Title 18, United States Code,

Section 2314.

67.     As a result of the foregoing, the Defendant *in rem* is liable to

condemnation and to forfeiture to the United States, in accordance with Title 19, United States

Code, Section 1595a(c)(1)(A).

## THIRD CLAIM FOR RELIEF

68.     Plaintiff repeats the allegations of paragraphs 1 through 61 as if fully set

forth herein.

69.     The Defendant *in rem* is designated archaeological or ethnological

material that was exported from Iraq and imported into the United States in violation of Title 19,

United States Code, Section 2606.

70.     As a result of the foregoing, the Defendant *in rem* is liable to

condemnation and to forfeiture to the United States, pursuant to Title 19, United States Code,

Section 2609.

WHEREFORE, plaintiff, United States of America, requests that the Defendant *in

rem* be forfeited and condemned to the use of the United States of America; that the plaintiff be

awarded its costs and disbursements in this action; and for such other relief and further relief as

this Court deems just and proper.

Dated:   Brooklyn, New York
         July 16, 2021

                                        JACQUELYN M. KASULIS
                                        Acting United States Attorney
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201

                        By:            /s/
                                        Sylvia Shweder
                                        Assistant U.S. Attorney
                                        (718) 254-6092
                                        sylvia.shweder@usdoj.gov

                                        DEBORAH CONNOR
                                        Chief, Money Laundering and Asset
                                        Recovery Section

                        By:            /s/
                                        Ann Brickley
                                        Trial Attorney
                                        Money Laundering and Asset Recovery
                                        Section
                                        U.S. Department of Justice
                                        ann.brickley@usdoj.gov

## VERIFICATION

JOHN PAUL LABBAT, hereby declares as follows:

1.      I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations.

2.      I have read the within Amended Verified Complaint *in rem* and know the contents thereof.

3.      I believe the matters contained in the within Amended Verified Complaint *in rem* are true and accurate to the best of my knowledge, information and belief.

4.      The source of my information and the grounds for my belief are personal knowledge and information provided by other law enforcement officers and the official files and records of the United States of America.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: Brooklyn, New York
        July 16, 2021

_____
John Paul Labbat
Special Agent
U.S. Department of Homeland Security,
Homeland Security Investigations

**Exhibit A**
Image of the Defendant *in rem*

